**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

IN THE MATTER OF THE SEARCH OF )

The entire premises of      Church Road, )
Centreville, Illinois, 62207, including the )
detached garage.   The residence is a grey )
colored brick & siding, two-story structure )
with a two-car detached garage.   There is a )
small porch on the front of the house with )
white railing.   Several windows on the first )
floor of the residence have maroon colored )
awnings above them.   The front door of the )
residence is white storm door with maroon )
trim surrounding it.   The residence faces )
towards the southwest, and is the second )
structure south of Anne Street on Church )
Road. )

CASE NUMBER 12-mj-3002-DGW

**FILED UNDER SEAL**

**FILED**

**JAN 0 4 2012**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

**APPLICATION AND AFFIDAVIT**
**FOR SEARCH WARRANT**

I, Joseph R. Murphy, being duly sworn depose and say:

I am a Special Agent with the Federal Bureau of Investigation, and have reason to believe

that on the person or premises known as:

The entire premises of      Church Road, Centreville, Illinois, 62207, including the detached garage.   The residence is a grey colored brick & siding, two-story structure with a two-car detached garage.   There is a small porch on the front of the house with white railing.   Several windows on the first floor of the residence have maroon colored awnings above them.   The front door of the residence is white storm door with maroon trim surrounding it.   The residence faces towards the southwest, and is the second structure

south of Anne Street on Church Road. A photo of the subject property is affixed to this application as "Attachment C."

in the Southern District of Illinois there is now concealed a certain person or property, namely:

### *SEE ATTACHED LIST, ENTITLED "ATTACHMENT A"*

which constitutes evidence of the commission of a criminal offense or which is contraband, the

fruits of crime, or things otherwise criminally possessed, or which is designed or intended for use

which is or has been used as the means of committing an offense in violation of Title 18 United

States Code, Section 641 (theft or conversion of government property).

The facts to support the issuance of a Search Warrant are as follows:

### *SEE ATTACHED AFFIDAVIT OF FBI SPECIAL AGENT JOSEPH R. MURPHY, ENTITLED "ATTACHMENT B"*

Stephen Wiggington
United States Attorney

STEVEN D. WEINHOEFT
Assistant United States Attorney

State of Illinois        )
                         )  SS.
County of St. Clair      )

Sworn to before me, and subscribed in my presence on the 4th day of January,

2012 at East St. Louis, Illinois.

**HON. DONALD G. WILKERSON**
United States Magistrate Judge

2

**Attachment A**
**Michael Baxton, Sr. Residence**
**██████ Church Road, Centreville, IL**

1)    GAMING CONSOLES: Microsoft XBOX 360 gaming consoles, including but
not limited to the following:

        i.    Serial Number – 607905110205
       ii.    Serial Number – 608199210205
     iii.    Serial Number – 608095710205
     iv.    Serial Number – 608250710205

This includes any games that can be played on the XBOX 360 gaming console, receipt of
purchase for gaming consoles, receipt of purchase for games to be played on the XBOX
console, receipts for renting games to be played on the gaming console, XBOX game
controllers or other related peripherals used in conjunction with XBOX gaming consoles.

2)    COMPUTER EVIDENCE:

    a. INTERNET RECORDS: Records related to internet usage, including internet
       service provider information, billing statements and all records related to
       internet accounts.

    b. PERSONAL ELECTRONIC MEDIA:  Telephones, fax machines, speed
       dialers, cellular telephones, smart phones, PDA's, digital pagers, voice pagers,
       alpha-numeric display pagers and all information stored therein, either written
       or electronic – including text messages, emails, address books, calendars and
       pictures/videos.  Agents are authorized to seize personal electronic media
       from the person of Michael Baxton, Sr.

    c. COMPUTER HARDWARE:  Computer hardware, including data-processing
       devices (such as central processing units, desktop computers, self contained
       "laptop" or "notebook" computers); internal and peripheral storage devices
       (such as fixed disks, floppy disks, external hard disks, floppy disk drives and
       diskettes, tape drives and optical storage devices, thumb-drives, and other
       memory storage devices); Microsoft gaming consoles; peripheral input/output
       devices (such as keyboards, printers, scanners, plotters, video display
       monitors, and optical readers); and related communications devices (such as
       modems, routers, cables and connections, recording equipment, speed dialers,
       programmable telephone dialing or signaling devices, and electronic tone-
       generating devices); as well as any devices, mechanisms, or parts, that can be
       used to restrict access to computer hardware (such as physical lock and keys).

    d. COMPUTER SOFTWARE:  Computer software, including programs to run
       operating systems, applications, utilities, compilers, interpreters, video, web
       browsers, and communications programs.

    e. COMPUTER DOCUMENTATION:   All computer-related documentation

**Attachment A**
**Michael Baxton, Sr. Residence**
██████Church Road, Centreville, IL

including written, recorded, printed, or electronically-stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

f.  PASSWORD AND SECURITY INFORMATION:  All computer passwords and data security devices, including encryption devices, chips and circuit boards.

g.  SURVEILLANCE EQUIPMENT AND RECORDINGS:  All Digital Video Recording equipment and surveillance recordings from the Village of Alorton Police Department.

3)    PROOF OF RESIDENCY:  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises subject to this warrant, to include: mail, deeds, leases or rental agreements, diaries, keys, identification documents, photographs or videotapes, utility and telephone bills, other account statements and bills, real estate tax statements, construction or improvement bills, materials purchase receipts, insurance documents, safety deposit box keys, and personal documents or photographs.

**Attachment C**
**Photos of Michael Baxton, Sr. Residence**
**████ Church Road, Centreville, IL**





**Attachment B**
**Affidavit Of Joseph R. Murphy**

STATE OF ILLINOIS           )
                                        ) ss.
COUNTY OF ST. CLAIR      )

I, JOSEPH R. MURPHY, under the penalty of perjury declare that I am over the age of eighteen and the information set forth in this Affidavit is true and correct to the best of my knowledge and belief:

**<u>Introduction:</u>**

1.      I am a Special Agent (S/A) with the Federal Bureau of Investigation (FBI) and have been so employed for nearly thirteen years. Prior to joining the FBI, I had eight years of prior law enforcement experience as a police officer and detective with the Metropolitan Police Department, City of St. Louis, Missouri. I am currently assigned to the Springfield Division of the FBI, Fairview Heights Resident Agency (FHRA), Metro-East Public Corruption Task Force (MEPCTF), and as such am vested with the authority to investigate violations of Federal criminal laws, including Titles 18 and 21, United States Code. I have primary investigative responsibilities for crimes occurring in the Southern District of Illinois. Affiant has been assisted in this investigation by the Internal Revenue Service/Criminal Investigations, as well as by other members of the FBI, and the Illinois State Police. This Affidavit is made in support of a warrant to search for and seize evidence. Because this affidavit is submitted for the limited purpose of establishing probable cause to obtain a search warrant, I have summarized a number of investigative findings, but I have not included the details of every aspect of the investigation.

1

2.     During the course of this investigation, several sources of information have been utilized, including but not limited to: the investigation of your Affiant, information derived from police reports, surveillance, covert audio and video recordings, an undercover law enforcement officer, interviews of law enforcement officers, interviews of witnesses/complainants, public records, surveillance, the work of other members of the investigative team, Confidential Human Sources, and other cooperating officers. All of the information contained in this affidavit is based on the personal knowledge of your affiant and the investigative sources of your affiant or was relayed to your affiant by other members of the investigation team. The facts to support the issuance of a search warrant for the premises described above are as follows:

**Background:**

3.     Randy McCallum, Sr. was elected mayor of the Village of Alorton (VOA) in April, 2005, by defeating incumbent mayor Carolyn Williams. Through surveillance, witness statements and a search of public records, your Affiant has confirmed that Randy McCallum lives at ▮ So. 42nd Street, Alorton, Illinois.

4.     Robert L. Cummings joined the Village of Alorton Police Department (VOAPD) in 1999, and was appointed Chief of Police by Randy McCallum in 2006. Robert L. Cummings remained in that position until he pled guilty in US District Court for the Southern District of Illinois on February 24, 2011, for filing false tax returns from 1999-2006.

5.     Mayor Randy McCallum appointed Michael Baxton as the VOA police chief. Baxton served as the VOA chief of police until October 14, 2011, when the Illinois Law Enforcement Training and Standards Board decertified Baxton as a police officer due to two felony convictions from 1982 (theft of more than $150, in Madison Co. case 81-CF-751; and

2

burglary, in Madison Co. case 81-CF-752). When Baxton was decertified, Mayor Randy McCallum appointed Gerald Crenshaw as the interim chief of police for the VOA. On November 17, 2011, a St. Clair County judge reinstated Baxton's law enforcement credentials because his felony convictions had been expunged in 1989. After being reinstated, Baxton was hired by the City of East St. Louis to be that city's police chief on November 30, 2011. Baxton has worked for various municipal police departments in St. Clair County, Illinois beginning in 1994. He has served as the Chief of Police Alorton, Brooklyn, and East St. Louis, Illinois. Baxton has also held other positions in law enforcement throughout the St. Louis, Metro east area. Baxton also worked as an attendance officer for the Cahokia Illinois School District and did work for the State Appellate Defender's Office as a Death Penalty Trial Assistant. While working as a police officer for at least one department Baxton was also a member of the Major Case Squad. Crenshaw remains the chief of the VOAPD as of the date of this application.

6.      Robert L. Cummings has a brother named Ronnie Cummings. Ronnie Cummings has prior felony convictions for possession of a controlled substance from 2001, and manufacture or delivery of a controlled substance from 2002. He was sentenced to 4 years in the Illinois Department of Corrections. Despite that conviction, Randy McCallum appointed Ronnie Cummings to be the VOA Street Superintendent.

7.      Harry A. Halter, Jr. has served as a police officer in Fairmont City and has served as the Public Safety Director for the VOA. Halter owns a local towing and mechanic business named Town & Country Towing, which until recently received nearly all of the VOA's towing business. Halter was arrested on September 24, 2011, for official misconduct charges brought in St. Clair County Court relating to Halter receiving oral sex from a woman in exchange for not arresting her for driving with a suspended license. Halter was placed on administrative leave

from the VOA on that date. Halter is also facing prosecution in federal court for two unrelated federal criminal matters (wire fraud for misapplying funds administered by the VOA tax increment financing (TIF) program; and tax offenses related to both his personal and business finances). ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

### Beginning of the Investigation:

8.      Prior to the start of the investigation, federal law enforcement received allegations that Alorton Mayor Randy McCallum was using his position to provide favorable treatment to his friends and family members and to protect his own drug business. When the allegations were first received ████████████████████████████████████████

Thereafter, over a period of time ████████████████████████ and a formal investigation was opened. During the course of the investigation, ████████████████

████████████████████████████████████████████████

████████████████████████████████████

        ██ ████████████████████████

           ████████████████████████

        ██ ████████████████

        ██ ████████████████

9.      On January 30, 2009, ████████████████████████ was interviewed. ██

████████████████████████████████████████████████

██



███████ ███████ ████████████████████████████████████████ stated that shortly after being elected, Randy McCallum formed a group of police officers who called themselves the "stunt crew," who conducted pro-active law enforcement activities targeting gun and drug offenders. ███ stated that Mayor McCallum has a ████ named ████ ████████████████████ that are well known drug dealers in the Alorton community. These two individuals are identified as █████████████████████. ██████ █████████████████████████████████ advised that Randy McCallum was using the police department to shut down drug dealers who were competing with █████████.

10. ████████ stated that Randy McCallum controlled the distribution of Tax increment Financing (TIF) funds within the VOA. ████ stated that Randy McCallum used those funds to reward his allies, which was a great source of power within the VOA. ████ stated that TIF awards were routinely given out as "gifts," and that recipients did not have to prove that any improvements were actually made. The recipients were not require to repay the funds, even when the repairs were not made. On April 23, 2010, █████ was interviewed ████████ further opined that the TIF program had serious problems. ████ reported that ████ had knowledge that several persons received TIF funds but did not have the work done or were required to provide a kickback to Mayor Randy McCallum, including the following:

    a. █████████████████ ████████ had to give money back to the mayor. █████ got $4,000 and had to kick back $2,000 to the mayor. The brother-in-law was complaining about the matter. █████████ knew him by the nickname of ██████████.

    b ██████ stated that several of McCallum's ██████████ received TIF awards, including █████████████████████ as well as McCallum's ███████ and ████.



   c.                      the owner of a ▮▮▮▮▮▮▮▮▮▮

   d.    ▮▮▮▮▮▮▮ was alleged to be a relative of McCallum who also works at the VOA ▮▮▮▮ was alleged to have taken his family on a vacation to ▮▮▮▮▮▮ with the TIF award that he received.

   e.    Businessman Harry Halter was alleged to have received TIF funds for a fence and that he never completed the work.

   f.    ▮▮▮ personally applied for and received TIF funds. ▮▮▮ stated that received TIF funds, despite ▮▮ history of politica ▮▮▮▮▮▮▮ because ▮▮ had knowledge of his corruption and McCallum feared that may report the matter.

   g.    ▮▮▮ also stated that the owner of the ▮▮▮▮▮▮▮▮ asked ▮▮▮▮ what was going on at the VOA because his store was running out of cash and he needed to go to the bank because so many people were cashing $4,000 checks from the VOA. (It is well known to your Affiant that ▮▮▮▮▮▮ store is a popular location for VOA residents to cash checks.)

### Tax Increment Financing:

11.    Tax Increment Financing (TIF) is a form of local financing that allows local governments to invest money into private developments occurring within identified "blighted" geographical areas, with the spending being paid for with debt financed through anticipated future tax revenues that are expected to be generated as a result of the new development. Improving blighted areas oftentimes requires public investment to spur economic development because these areas offset the extra costs and risks that private developers are usually unwilling to incur. Because TIF financing relies on leveraging future tax revenues, municipalities are enabled to make the improvements, like new roads or sewers, and provide incentives to attract new businesses or help existing businesses stay and expand without expending general municipal revenues or raising taxes.

12.    The VOA has established a TIF district, pursuant to the Illinois' Tax Increment Allocation Redevelopment Act. The TIF district is supported in large part by tax revenues

generated by a local business named "The Flying J." TIF funds received by the VOA must be spent on TIF-eligible costs, as defined by Illinois law, such as: property acquisition, construction of public works or improvements, demolition, rehabilitation of existing public or private buildings, etc. However, evidence has been developed that Randy McCallum awards TIF funds to political allies or personal friends who in turn kickback a portion of the TIF funds to McCallum. The TIF recipient does not use the funds for their intended purpose and the recipient's property is not inspected by the VOA.

13. On October 2, 2009, then █████████████████████ met with federal agents and prosecutors for an interview related to ██████████████████ was not represented by counsel and ████ statements were not protected by a proffer agreement. ████████ ████████ advised that the mayor decides who receives TIF funds and that Randy McCallum often receives kickbacks in exchange for TIF funds. ████████ advised that █████████ ████████ received TIF funds in the amount of $2,500 - $3,000 and that ████ was required to give $1,000 back to Randy McCallum. ████████████ said he knew this to be true, because ████████████████████ served as a middle man to deliver the kickback to the mayor. On June 16, 2010, ███████████ was subpoenaed to testify before the Federal Grand Jury sitting in East St. Louis, Illinois. In addition to being questioned about ████████████ ████████████████ was asked about whether ███ had received any TIF funds. ████ ████████ was initially evasive, but ████ ultimately admitted that ███ received $4,000 in TIF funds from the VOA and that ███ was required to kickback $1,000 of the money to Mayor McCallum. ████████ testified that ███ gave the money to ████████████████ to deliver to the mayor on her behalf. However, █████ stated that ████ knew McCallum received the money because ████████████████████ McCallum verified that he had received ████

7

payment. ████████████ also acknowledged that ███████████ and Randy McCallum are ███ friends.

14.    On October 2, 2009, ████████████ also advised that Harry Halter received TIF funds to construct a fence around his business, Town & Country Towing, but that Halter had kept the money without building the fence. ██████████, and ███████████ had previously made the same accusation.  Further investigation confirmed the allegation to be true. Village records confirmed that on December 2, 2008, Halter completed and signed an application for TIF funding from the VOA.  In that application, Halter sought $25,000 purportedly for the construction of a new fence to surround the perimeter of the property of Town & Country Towing, located at 4975 Bond Avenue, Alorton, Illinois.  According to the TIF application, construction on the fencing was scheduled to begin on January 5, 2009, and be completed by February 15, 2009.   The Village of Alorton approved Halter's TIF application, and on January 29, 2009, the village issued a check in the amount of $24,990 for the construction of 750 linear feet of fencing around Town & Country Towing.  On February 2, 2009, that $24,990 check was deposited into Region's Bank account ███████████ owned by "Harry A. Halter, DBA Town & Country Towing."  In the time period beginning January 1, 2009, through March 31, 2009, Halter spent $5,932.38 of the TIF funds on materials related to the construction of the fence. However, rather than using the remaining $19,057.62 as intended, Halter converted those funds to pay personal expenses and business expenses unrelated to the construction of the fence, such as checks to pay personal credit cards and checks to pay Kinkaid Village Marina for personal recreational boating expenses.  ███████████████████████

████████████████████████████████  ████████████

████████████████████████████████

8

████ ████ Halter's checking account records did reflect an $800 payment to Randy McCallum in April, 2009. ████████████████████

████████████████████████████████

████████████████

15.    On October 2, 2009, ████████ also stated that Randy McCallum's ████, named ████████, received TIF money.

16.    On October 2, 2009, ████████ also confirmed that Randy McCallum interferes with police decisions concerning who to arrest and ticket. ████ stated that McCallum voids tickets for neighbors and friends and directs the police on how to exercise their arrest authority. ████████ quoted the mayor as saying, "I run this motherfucker," when referring to his authority over the village and the police department.

17.    On October 2, 2009, ████████ discussed the fact that Randy McCallum's son, Randy McCallum, Jr. had left town and he was hiding at a relative's house because he was being sought in connection with a double murder that occurred in Washington Park in September. ████████ advised that Randy McCallum Jr. is "good for it;" meaning that Randy McCallum's son committed the murders.

18.    On April 13, 2010, ████ stated that ████████████ complained that ████████ received a $1,600 TIF award for ████████ in his yard, but that they had to give the mayor $1,000 back, which left only $600 ████████

19.    On May 17, 2010, ████████ participated in ████ interview with federal investigators and one AUSA. This time ████████ was represented by counsel and █ ultimately executed a proffer agreement. In that meeting ████ alleged that the cash deposits to the VOA were being stolen. ████████ allegation regarding cash thefts was

9

supported by a village audit conducted by J.W. Boyle & Co., Ltd.  The accounting firm expressed concern over the absence of any cash being deposited into the village accounts.  The accountants noted that it was impossible that the village didn't occasionally come into cash receipts.

██████ further stated that a ██████████ named ██████████ had contacted McCallum about being sponsored for the 40 hour firearms training course required as a prerequisite to full-time police employment.  McCallum told ███████ that he would meet with him, and that ███████ "needed to bring his checkbook."  ███████ also said that Michael Baxton is on the police roster being paid, but that he isn't working for the VOA.  Rather, ██████ stated that Baxton was serving as an investigator for the defense attorney representing the mayor's son, Randy McCallum, Jr., who was formally charged with first degree murder for the September 18, 2009, murder of Kevin McVay and Charles Black occurring in Washington Park.

20.    On November 16, 2011, and November 21, 2011, federal agents and prosecutors met with ██████████ attorney for an interview according to the terms of a negotiated proffer letter.  Halter admitted that he misapplied TIF funds ████████████████



██████████ stated that it is common practice in the VOA for people to receive TIF money and use those funds for other purposes.  ████ provided agents with a list of people who have engaged in similar conduct, including:

    a.    ████████████████ allegedly received $25,000 - $29,000 for ████████████████ that he owns, but ██████████ was never ████.



b. The operator of ██████████, who goes by the name of ██████ received approximately $20,000 purportedly to construct a ██████ but ██████ the money for other expenses. ██████ stated that ██████ had been approved for $29,000 but only $20,000 was dispersed, so it is likely that someone stole $9,000.

c. ██████ received $4,000 and took his family to ██████.

d. A woman with the last name of ██████ received $4,000 - $5,000 for ██ repairs that were never done.

21. On April 7, 2010, ████████████████████████████ ████████████████ provided the agents with a three page list of TIF projects that he stated had not been completed.

22. A ██████ named ██████████, who ████████████████████, was interviewed on April 16, 2010. ██████ repeatedly denied applying for TIF funds while interviewed. ██ persisted in ██ denials until agents confronted ██ with application paperwork that ██ signed seeking TIF funds purportedly to ████████████████████████ ████████████ ultimately admitted that she sought the money to ████████████, but ██ spent the money on other items. ██████ denied paying kickbacks to anyone at Alorton.

23. TIF awards from the VOA involve the transfer of funds, the issuing and cashing of checks, that involve foreseeable interstate wire transmissions that involve interstate banking channels.

**Misuse of the Authority of the Alorton Police Department:**

24. ██████ has provided your Affiant with numerous examples of cases where the mayor or the chief of police have intervened to provide favorable treatment to arrestees who are family members or associates of the mayor or the chief. Further, your Affiant has developed a

substantial number of complaints regarding a serious problem with seized evidence, including guns and drugs disappearing from the VOAPD.

25.    On June 8, 2011,  described a problem with evidence from the VOAPD not being sent to the Illinois State Police (ISP) for testing. ███████████ stated that since 2010, to the best of ███ knowledge that no drugs have been submitted to the ISP laboratory from the VOAPD.

26.    ████████████████████████████████

███████████████  ████████████████████████

████████████████

27.    ████████████████████████████████

███████████  ████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████ understood ██████████ be saying that you do not mess with the mayor's friends or family.

28.    On March 31, 2011, ██████████ stated that approximately two weeks earlier that an Alorton police officer ████████████████ responded to a domestic disturbance call. During the call, the officer patted the suspect down and discovered gun in his possession. A trace of the weapon revealed that the firearm was registered to the Alorton Police Department. The mayor

told the responding officer to drop the matter and the subject was not charged with any criminal offenses. The gun was last known to be in the chief's office.

29. On March 31, 2011, ████ stated that had a conversation with ████ who told him/her that a ████████████████, was caught with 27 individually wrapped bags of marijuana. ████ stated that ████ resisted arrest and fought with ████████ during the encounter. ████ advised that ████████ has a ████████ relationship with the mayor's ████████. ████ was held on an outstanding warrant from ████ County, Illinois, but he was not charged with the marijuana or the assault because the mayor told the police officer not to charge him. ████ said that the location of the 27 bags of marijuana is unknown.

30. On March 31, 2011, ████ also stated that ████████████ ████████████ were dealing drugs outside directly behind the mayor's home.

31. On June 18, 2011, ████████ met with your Affiant to express concern that drugs and guns are missing from the VOAPD evidence area. ████████ believes that the mayor and Chief Baxton are stealing evidence for their personal use and/or profit. ████ provided your Affiant with the computerized police reports for seven specific cases that would illustrate the problems at the VOAPD. Those cases are as follows:

    a. May 21, 2011, Report ████████ ████████ arrested a driver at checkpoint and marijuana was booked into evidence. No warrants were sought by the VOAPD and the evidence was not sent to the Illinois State Police (ISP) forensic laboratory for testing. ████████ was told that the matter was "squashed" because the arrestee was a family member of East St. Louis Mayor Alvin Parks. ████████████ Two days after this particular arrest, ████ asked Chief Michael Baxton whether there was any evidence that needed to go to the lab, and Chief Baxton said "no."

b. May 27, 2011, Report █████████ ██████ conducted a traffic stop and seized a large bag of marijuana and $116, and issued traffic citations. The driver was also wanted for an outstanding arrest warrant. The tickets were torn up and the drug evidence was not sent to the ISP crime lab. The arrestee was only booked on the warrant because he was a friend of Chief Baxton. The evidence subsequently could not be located.

c. July 18, 2010, Report ██████████████ th conducted a traffic stop and seized marijuana from a subject who had 2 prior drug arrests. The entire file is missing and no evidence was sent to the lab.

d. March 28, 2011, Report ████████████ arrested a defendant named █████████ and seized 25 bags of marijuana. ████████ was also arrested, but given an NTA (notice to appear). No warrants were sought by the VOAPD, and the evidence was never sent to the lab. In fact, the evidence sheet and photographs of the evidence are missing. ████████ indicated that ████████ is allegedly related to Mayor McCallum. ███████████████████████████ ██████████████████████ ████████

e. April 12, 2011, Report ██████████ conducted a traffic stop and seized marijuana. No warrants were applied for by the VOAPD and no evidence was ever submitted to the ISP lab.

f. April 6, 2011, Report ████████ ██████ conducted a traffic stop on a driver who was wanted on a warrant and seized 15 individually wrapped bags of marijuana. No warrants were applied for and no evidence was conveyed to ISP lab.

g. April 15, 2011, Report ███████████████ arrested two subjects – one for crack, one for marijuana. No warrants were applied for, and no evidence sent to ISP lab.

32.  ████████████ explained the process for seizing evidence within the VOAPD as follows:  after an officer seizes evidence at the scene, the officer is responsible for completing an evidence inventory sheet. That sheet is attached to the evidence bag that secures the seized item. The evidence bags and evidence sheets are then dropped into a locked evidence cabinet. The only person with access to that cabinet is the chief of police. After the chief collects the

evidence, he turns it over to the assistant chief who is responsible to transport items to the ISP crime lab for processing.

33. On March 28, 2011, ▮▮▮▮ reported that ▮▮▮▮▮▮ arrested ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ seized a large plastic bag containing 25 smaller bags of marijuana and United States Currency bundled in fives, tens, and twenty dollar bills. ▮▮▮▮▮▮▮▮ completed a police report and booked the drugs and money into evidence. Your Affiant knows this to be common evidence of drug distribution▮▮▮▮ advised that ▮▮▮▮▮▮ sustained injuries during the arrest requiring treatment at Touchette Hospital. The case was not referred to the St. Clair County States Attorney's Office for prosecution because the mayor told then Chief Baxton to drop the matter.

Your Affiant spoke to ▮▮▮▮▮▮ and asked about this incident. ▮▮▮▮▮▮ confirmed the details of the arrest, and that he had completed a report and booked the marijuana and US Currency into evidence at the VOAPD. ▮▮▮▮▮▮ said that the police report can no longer be located in the VOAPD computerized reporting system and the evidence cannot be accounted for. Later, ▮▮▮▮▮▮ asked Chief Baxton about ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮t the status of the prosecution of the case. Chief Baxton told ▮▮▮▮▮▮ not to pursue ▮▮▮▮▮▮▮▮▮ and to drop the matter. ▮▮▮▮▮▮ believes Mayor McCallum directed the chief not to charge the subjects and the marijuana either be returned to the subjects or given to Mayor McCallum. ▮▮▮▮▮ opined the mayor is covering for his family members and the evidence has been possibly removed illegally from the evidence area.

34.    ███ reported that on July 7, 2011, that ██████████ made an arrest of three subjects ███████████████ for possession of 3 pounds of marijuana.    ███ took a videotaped statement from each suspect.    ███ admitted ownership of 2 pounds and ███ admitted to being responsible for the third pound.    One of the arrestees, ██████████, is a ███ of Randy McCallum.    ████████████████████████

███    █████████████████████████

████████████████████████████████

██████████████████    Baxton then told the mayor that ███ should be fired because he knew that the subject was McCallum's ███ when he obtained the warrant.    ████████ contacted ███ and told him that ██ was going to lose his job for getting a warrant on McCallum's ███    ████████████████

███    ██    ████████████████████████

████████████████████████████████

█████████████████████

35.    On October 14, 2011, ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████    ████████████████

████████████████████████████████

████████████████████████████████



36.  ███████ has recently worked ████████████████████████████
███████████████████████. ███████ has been utilized by the FBI since ██████ and ██████ has provided reliable information corroborated by numerous consensual recordings and physical evidence.

37.  However, ████████████████████████████████████████████
████████████████████████████████████████████████ ██████
████████████████████████████████████████████
████████████████ is not the subject of any criminal investigations and he/she agreed to cooperate in a covert capacity because ████████████████████████
██████████████ recognized that the VOA was experiencing a substantial problem with internal corruption.

38.     ████████████████████████████ recalled that Mayor Randy McCallum
got him/her a job with ████████████████████ ████████████████████
████████████████████████████. Mayor McCallum required ████████ to
provide him payment in the amount of his first check in exchange for getting ████ the job at
████████.

39.     Mayor McCallum also got a job for ████████████████████
████████████████████████████████████████████████
████████████████. Mayor McCallum similarly required ████████████ to pay McCallum
his first check in exchange for helping him get a job.

40.     During April - May 2009, ████████ reported that that Mayor McCallum wanted to
hire ████████████████████ However, VOA Mayor McCallum stipulated that
████████ first check and eight hours of overtime would have to be kicked back to McCallum
once ████ was hired. ████████████████████

41.     ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████ ██ ████████████████████████
████████████████████████████████████

    ██ ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

                        ■

[redacted]

43.　　　[redacted] began working in an undercover capacity and provided a significant amount of information during the course of the investigation. [redacted]

[redacted]

**Mayor Randy McCallum Directs [redacted] to Engage in Unlawful Conduct:**

44.　　On or about March 2, 2011, [redacted] was working at the VOAPD as an officer, however, he was still riding with a field training officer (FTO) and was not patrolling in his/her individual capacity. While still being supervised by an FTO, [redacted] was approached by Ronnie Cummings who advised [redacted] that once he/she was riding in a squad car without supervision that he/she would have to "pull some licks" and split the proceeds. This conversation occurred approximately two weeks before [redacted] was scheduled to begin riding alone. A "lick" is a well-known slang term used on the streets that often refers to a robbery, theft or other situation

19

where a person comes into money. When one "pulls a lick" or "hits a lick," it means that they have committed a robbery.

45.     On May 27, 2011, ▮▮▮▮ conducted a traffic stop which resulted in the arrest of a subject in possession of 1(one) large bag of marijuana, ▮▮▮▮ in U.S. Currency, and a box of sandwich bags ▮▮▮▮ completed his/her investigation to include securing the evidence into the evidence safe. The mayor heard about the arrest and contacted ▮▮▮▮ The mayor told ▮▮▮▮ when you get the "motherload" bring it to me. ▮▮▮▮ your Affiant that there is no reason that the mayor should have any contact with items of evidence and that therefore he opined that the mayor would keep any drugs and money that were brought to him. To date, ▮▮▮▮ advised no warrants have been applied for and the evidence from his seizure has not been conveyed to the ISP crime laboratory for testing.

46.     On or about June 6, 2011, ▮▮▮▮ was inside Mayor McCallum's house, located at ▮ So. 42nd Street, Alorton, Illinois. The two were talking, and McCallum mentioned that he had no money. Mayor Randy McCallum told ▮▮▮▮ that he wanted to put ▮▮▮▮ I "on a lick" and that they would talk more about it later. McCallum told ▮▮▮▮ to come back the next day. ▮▮▮▮ acted receptive to McCallum's comments.

47.     In a conversation on June 7, 2011, McCallum told ▮▮▮▮ that the lick involved a drug dealer named "Wolf" coming into Alorton to engage in weekly 20 lb. marijuana deals. ▮▮▮▮ understood McCallum to mean that he wanted ▮▮▮▮ to use his position as a police officer to make a traffic stop and take the marijuana from the drug dealer and then give the drugs to the mayor. On the morning of June 7, 2011, McCallum let it be known that he was going to get ahold of ▮▮▮▮ later about the identity of the drug dealer who would need to be stopped - but that he was busy trying to get air conditioner repaired at a shop that McCallum owns in